1

1          IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY

2                              PENNSYLVANIA

3                              ~  -  -

4

5     COMMONWEALTH OF          CRIMINAL DIVISION
      PENNSYLVANIA,            OTN: G674383-3
6

7          PLAINTIFF,

8
      vs.                      NATURE OF PROCEEDINGS:
9                              Audio Preliminary Hearing

10    KENNETH GOLDSMITH,

11
           DEFENDANT.
12

13
                              TRANSCRIBED BY:
14                            Jeanne M. Nagy
                              Official Court Reporter
15

16                            HELD ON: 08-27-2014

17
                              HELD BEFORE:
18                            Magisterial District
                              Judge Derwin Rushing
19

20

21

22

23
      FOR THE COMMONWEALTH:
24    Julie Capone, Assistant District Attorney

25    FOR THE DEFENDANT:
      James Sheets, Esquire

**Exhibit 3**

1                               **I N D E X**

2

3         WITNESS:                                        PAGE:

4         **JAMES TOGYER:**
          Direct Examination by
5                  Ms. Capone                              4

6         **LILLIAN GOLDSMITH**
          Direct Examination by
7                  Ms. Capone                              8
          Cross-Examination by
8                  Mr. Sheets                              12

9         **NORMA PETERS**
          Direct Examination by
10                 Ms. Capone                              19
          Cross-Examination by
11                 Mr. Sheets                              22
          Redirect Examination by
12                 Ms. Capone                              25

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    August 27, 2014
 2                  P R O C E E D I N G S
 3                       ---o0o---
 4             THE COURT:  This is the time set for
 5    the preliminary hearing for Kenneth Goldsmith;
 6    case number OTN G674383-3, Judge Rushing
 7    presiding.
 8             All parties who are going to testify,
 9    please raise your right hand to be sworn.
10             MS. CAPONE:  Your Honor, I do have
11    three other witnesses in the hallway that
12    Mr. Sheets wanted sequestered.  So they're waiting
13    in the hallway.
14             THE COURT:  Okay.  Why don't you just
15    bring them in and we'll get everybody sworn in.
16             MS. CAPONE:  One is 85, so it's going
17    to take me a minute.
18             THE COURT:  Well, wait.  Hang on.  We
19    can swear her in when she's going to testify.
20             MS. CAPONE:  Okay.  Thank you.
21                  (All parties sworn.)
22             THE COURT:  Is he one of your
23    witnesses?
24             MS. CAPONE:  No, he's from the DA's
25    office.  I'm sorry.
```

4

```
 1                    THE COURT:  All right.
 2                    Counsel, identify yourself for the
 3       record.
 4                    MS. CAPONE:  May it please the Court,
 5       Your Honor; Julie Capone on behalf of the
 6       Commonwealth.
 7                    MR. SHEETS:  Good afternoon.  May it
 8       please the Court; James Sheets for the Defendant,
 9       Kenneth Goldsmith.
10                    Your Honor, we enter a plea of not
11       guilty and waive any formal reading.
12                    THE COURT:  Okay, thank you.  All
13       right, let's proceed.
14                    MS. CAPONE:  Thank you, Your Honor.
15       Commonwealth would call the officer.
16                         JAMES TOGYER,
17       called as a witness herein, having been first duly
18       sworn, was examined and testified as follows:
19                    DIRECT EXAMINATION BY MS. CAPONE:
20                    MS. CAPONE:  Q.  Can you please state
21       your name for the record?
22            A.    James Togyer, T-O-G-Y-E-R.
23            Q.    And how are you employed?
24            A.    City of Pittsburgh police officer,
25       assigned to Zone 4 in the city.
```

1          Q.     Were you working in that capacity on

2     April 1st, 2013?

3          A.     Yes, I was.

4          Q.     And did you respond to the residence of

5     the victim's named Lillian Goldsmith?

6          A.     Yes, I did.

7          Q.     Are you familiar with this residence?

8          A.     I am familiar with the residence.

9     We've responded there several times.  Numerous

10    times, actually.

11         Q.     What are the natures of the calls that

12    --

13                MR. SHEETS:  Your Honor, I'm going to

14    object to this as to relevance.  I mean, we're

15    here today for a preliminary hearing on three

16    specific charges that allegedly occurred on or

17    before April 1st.

18                MS. CAPONE:  Your Honor, it would go to

19    show that there's been a pattern that's part of

20    the criminal trespass and the harassment of the

21    Defendant towards the victim, which is his mother.

22    And the police being familiar with this, I think

23    it is very relevant.

24                THE COURT:  Well, you know, I'll allow

25    some limited testimony.  The objection is noted,

1     however.

2                    MR. SHEETS:   Thank you, Your Honor.

3                    MS. CAPONE:   Q.   Can you briefly tell

4     the Court, how are you familiar with the

5     residence?

6          A.    Officers, including myself, have

7     responded multiple times over the years for

8     incidents involving the victim, Lillian, and her

9     son Kenneth.

10                   THE COURT:   All right.   Let's go.

11                   MS. CAPONE:   Q.   And do you see the

12    Defendant today in the courtroom?

13         A.    Yes, the gentleman in the bow tie.

14                   MS. CAPONE:   Please let the record

15    reflect the officer identified the Defendant.

16                   THE COURT:   The record will so reflect.

17                   MS. CAPONE:   Thank you.

18         Q.    And on April 1st, what was the call

19    for?

20         A.    Ms. Goldsmith had called a report that

21    her son Kenneth had been in the house, and she was

22    missing a cell phone and car keys.

23         Q.    Okay.   And did you document that and

24    make a report?

25         A.    Yes, I did.

1          Q.     Okay.  And you also charged criminal

2     trespass; is that correct?

3          A.     Yes.

4          Q.     Go ahead.  What was the basis of that?

5          A.     According to Ms. Goldsmith, there is a

6     civil no-contact order that she stated that he is

7     not to have contact with her or be in the house.

8          Q.     Okay.  And so based on the information

9     you received, which we will hear from Lillian

10    Goldsmith, you filed a criminal trespass,

11    harassment and theft?

12         A.     Yes.

13              MS. CAPONE:  Offer for cross.

14              MR. SHEETS:  No questions on cross.

15              MS. CAPONE:  I'm going to go get

16    Lillian if that's all right, Your Honor.

17              THE COURT:  All right.

18              MS. CAPONE:  You're going to get sworn

19    in.

20              THE COURT:  Will you raise your right

21    hand, please?

22                   LILLIAN GOLDSMITH,

23    called as a witness herein, having been first duly

24    sworn, was examined and testified as follows:

25              THE COURT:  Great.  Thank you.

1           MS. CAPONE:  Thank you, Your Honor.

2           DIRECT EXAMINATION BY MS. CAPONE:

3           MS. CAPONE:  Q.  Ma'am, could you

4  please state your name and spell your last name

5  for the court reporter, please?

6       A.    Lillian Simon Goldsmith,

7  G-O-L-D-S-M-I-T-H.

8       Q.    And Ms. Goldsmith, are you related to

9  the Defendant Kenneth Goldsmith?

10      A.    Yes.

11      Q.    How are you related?

12      A.    I'm his mother.

13      Q.    Okay.  And do you see him today in the

14  courtroom?

15      A.    Yeah.

16      Q.    Could you identify him for us?

17          MR. SHEETS:  Stipulate to the

18  identification.  It's her son.

19          MS. CAPONE:  Thank you.

20      Q.    Ms. Goldsmith, I'm going to draw your

21  attention back to April 1st of 2014.  On that

22  date, were you living in Squirrel Hill?

23      A.    Yes.

24      Q.    Okay.  And prior to this, had Ken

25  Goldsmith been living with you at any time prior

9

1      to that?

2              A.      Sometimes, yes, before.

3              Q.      On this particular day of April 1st,

4      2014, was he permitted to be in your house?

5              A.      I don't remember.  My husband had just

6      died March 21st, on our 61st wedding anniversary.

7      I don't know who came from out of town for the

8      funeral.  I'm sorry.

9              Q.      Okay.  Was there a no-contact order

10     between you and Ken Goldsmith?

11             A.      I thought there had been.

12             Q.      Was that from another court?

13             A.      Yes.

14             Q.      It said he was not allowed 300 feet

15     within your home?

16             A.      That's correct, yes.

17             Q.      And on this particular day, did he come

18     into your home?

19             A.      I'm sorry, I don't remember.  April?

20             Q.      April 1st, around that date.  Do you

21     recall your keys and phone missing, being -- you

22     could not find them?

23             A.      I think that was a long time ago.

24             Q.      On this particular -- do you recall

25     calling the police ever to report that Ken was in

10

1    your home?

2        A.    Not recently.  My husband died March

3    21st.  He was not there after March 21st.

4        Q.    But do you recall ever calling the

5    police to say that Ken was not allowed at your

6    home?

7        A.    Yes.

8        Q.    Okay, you did call the police.  Okay.

9    And asked that they remove him from your home?

10            (No response.)

11            Okay.  And do you recall your cell --

12    him taking your cell phone and car keys?

13       A.    I couldn't find them and so I had to

14   get towed by the Three A's to the East Pittsburgh

15   Nissan dealer to have the car -- create a key for

16   my Nissan and -- two keys, two identical keys.

17   They did not give me a remote for a night alarm.

18   They said I'd have to come out there again to pay

19   $150 extra.  So for the moment, I don't have a

20   remote.

21       Q.    Okay.  Ms. Goldsmith, do you recall

22   speaking with Kenneth about your phone and keys

23   and him admitting that he had them?

24       A.    He said he left them I think on the

25   side steps, the side door.  And they weren't

11

1    there.  I don't remember the date.  Maybe later

2    that day, they appeared.

3         Q.    After you spoke with him?

4         A.    Yes.

5         Q.    And had he called you from your own

6    phone on that day?

7         A.    My own phone?

8         Q.    Did he call you from your cell phone to

9    your home phone on that day?

10        A.    I don't know, ma'am.  I started losing

11   it at 84.

12        Q.    That's okay.  You have another son

13   named Fred; is that correct?

14        A.    Yes.

15        Q.    He has been present during a lot of

16   this; is that correct?

17        A.    He lives down -- two blocks down the

18   street from the house.  He's a lawyer.

19        Q.    Okay.  And do you know a woman named

20   Norma Peters?

21        A.    She's here with me.

22        Q.    And who is she?

23        A.    She is a -- she's a day-worker, but

24   she's been with us for years.  And so kind to my

25   husband who was dying.

12

1       Q.    Okay.

2       A.    Upstairs.

3       Q.    And has she -- she's been at your home

4   a lot when Kenneth has showed up; is that correct?

5       A.    Yes.

6             MS. CAPONE:  Offer for cross, Your

7   Honor.

8             THE COURT:  Okay.  Cross?

9          CROSS-EXAMINATION BY MR. SHEETS:

10            MR. SHEETS:  Q.  Ms. Goldsmith, good

11  afternoon.

12      A.    Who are you?

13      Q.    My name is Jimmy Sheets.

14      A.    Hi.

15      Q.    I have the privilege of representing

16  your son today, okay?

17            THE SHERIFF:  Turn your body towards

18  the judge and look at the judge.

19            MR. SHEETS:  I need a moment.

20      Q.    How many years young are you,

21  Ms. Goldsmith?

22      A.    I was 84 in April.

23      Q.    Happy birthday, belated.

24      A.    It (inaudible) happy.

25      Q.    The items that were supposed to be

13

1    missing, according to the police report, okay,

2    were your cell phone, correct?

3         A.    I think that's correct, yes.

4         Q.    Okay.  And do you recall if it was on

5    or about April the 1st of this year that you

6    couldn't find your phone?

7         A.    I wish to say, sir.  I don't mean to be

8    evasive.  I don't remember.  Kenneth had just died

9    March 21st.  And it was a Friday that he died.

10   And in -- I didn't know it, but in the Jewish

11   religion, you can't get buried on Saturday, which

12   I didn't know.  So they -- he had died that

13   morning, and at 5:00 that afternoon, he was

14   buried.  So it was pretty raw.

15        Q.    Right.

16        A.    So that's April 3rd.

17        Q.    Okay.  And you have that phone back

18   now; is that right?

19        A.    Yes, sir.  T Mobile.

20        Q.    Right.  And the criminal complaint also

21   alleges that you were missing a key or remote from

22   your Nissan.  Do you have those things back?

23        A.    No.  I only had the car towed by Three

24   A's to East Pittsburgh.  I got the two ignition

25   keys.  They did not give me a remote, which would

14

1     be nice to have had it at night alone.  They said

2     they would charge me $150 to create one.

3          Q.    Okay.

4          A.    And things being financially -- I

5     didn't know what was going on -- I've never gotten

6     a remote.

7          Q.    Okay.  When did you have that car

8     towed?

9          A.    The Three A's would have a record of

10    it, sir.  It was to get a key.

11         Q.    Right.  But that was prior to April

12    1st?

13         A.    Yeah.  I'm sorry, yeah.

14         Q.    Okay.  And then when you got the two

15    keys made.  You put one on your key ring?

16         A.    Yes.

17         Q.    And you hung one in your kitchen?

18         A.    Yes, sir.

19         Q.    Okay.  And on April 1st, when the

20    officer came to your home, what was missing was

21    your cell phone and the key that hangs in the

22    kitchen; is that right?

23         A.    I'm sorry, sir.  I don't remember.  It

24    was just --

25         Q.    Okay.  That's fine.

1        A.      People came in from out of town.

2        Q.      And there had been people at your home

3    because of your husband's passing?

4        A.      Yes, it was a memorial service for him

5    a week later at Phipp's Conservatory.  People did

6    come in from out of town.

7        Q.      Did anyone stay with you?

8        A.      No.

9        Q.      Okay.  And Ms. Goldsmith, on or about

10   the April 1st date that we're talking about, okay,

11   as best as you can remember, one of the things

12   that Kenneth is being accused of is harassing you

13   by calling you repeatedly.  Do you recall if that

14   happened?

15       A.      I think there was a previous order a

16   long time before that he was not to contact me.

17   Even in public.  And had to be 300 feet away or

18   something like that.

19       Q.      Right.  But on April 1st, do you recall

20   him calling you repeatedly?  Just only if you

21   recall.  I understand -- I'm not trying to beat

22   you up.

23       A.      He was present at my husband's service

24   at Philips Conservatory.

25       Q.      Okay.

16

1          A.     No, I don't recall.  I'm sorry, sir.

2          Q.     That's okay.  Were you -- were you

3     afraid of Kenneth based on him calling you

4     repeatedly?

5          A.     I'm not comfortable in his presence

6     anymore since he ripped a phone cord out a long

7     time ago.

8          Q.     A long time ago.

9          A.     It was a matter of record.  I don't

10     remember.  The police did come to the house.

11          Q.     And --

12          A.     My son Frederick I think has the ripped

13     phone cord.

14          Q.     Okay.  I don't doubt that.

15               And on April 1st of this year, do you

16     recall Kenneth being in your home when he wasn't

17     supposed to be?

18          A.     I don't recall, sir.  Sorry.  It was

19     two days before my birthday.  I was going to be

20     84.

21               MS. CAPONE:  Your Honor, I think she's

22     been asked and answered repeatedly about April

23     1st, that she does not recall if that was the day

24     he came there.

25               MR. SHEETS:  I understand, and I'm

17

1       getting close here.

2                   THE COURT:  Overruled.

3                   MR. SHEETS:  Q.  Do you remember

4       calling me at some point since these charges were

5       filed?

6           A.      I got a phone message on my cell -- my

7       home cell phone -- no, my home phone, kitchen

8       phone.  And it said your name and your phone

9       number.  If you are Mr. --

10          Q.      Sheets.

11          A.      Sheets.

12          Q.      Yes, ma'am.

13          A.      So I thought it was a gasoline company,

14      Sheets gasoline people.  That's why.  Because I

15      don't go there.  And then I talked to Frederick

16      and I said, "There's a man that's called me, a

17      Mr. Sheets."  And I said, "Do you know him?"  And

18      he said, "I think he's an attorney," and "He's not

19      allowed to call you."

20          Q.      Lillian, do you remember calling my

21      cell phone?

22                  MS. CAPONE:  Your Honor, I'm going to

23      object to beyond the scope of direct.

24                  THE COURT:  Sustained.

25                  MR. SHEETS:  Q.  Well, let me ask you

18

1    this question.  Do you remember after April 1st a

2    Mr. Ofterman from Western Psychiatric calling you

3    in an attempt to return your keys?

4         A.    I've made a note of a man Ofterman and

5    his phone number.  And I didn't know him.  But I

6    think I did talk to him.  I don't think I remember

7    any keys being mentioned at all.

8         Q.    Okay.

9              MR. SHEETS:  I don't have any further

10   questions.

11             MS. CAPONE:  No further questions, Your

12   Honor.

13             May I call my next witness, Your Honor?

14             THE COURT:  Yes.

15             MS. CAPONE:  Thank you.

16             MR. SHEETS:  I'm going to ask for an

17   offer.

18             MS. CAPONE:  I'm going to call Norma

19   Peters who is a caretaker of the victim, who was

20   present on the day in question where he came and

21   was not permitted to be there.

22             THE COURT:  Okay.

23             MS. CAPONE:  Thank you.

24             THE COURT:  Please raise your right

25   hand.

19

1                    NORMA PETERS,

2    called as a witness herein, having been first duly

3    sworn, was examined and testified as follows:

4              THE COURT:  Thank you.  All right,

5    proceed.

6              MS. CAPONE:  Thank you, Your Honor.

7           DIRECT EXAMINATION BY MS. CAPONE:

8              MS. CAPONE:  Q.  Ma'am, could you

9    please state your name and spell your last name

10   for the record, please?

11        A.    Norma Peters, P-E-T-E-R-S.

12        Q.    Okay.  And Ms. Peters, are you -- do

13   you know Lillian Goldsmith?

14        A.    Yes, I do.

15        Q.    How do you know her?

16        A.    I help her in the house, cleaning --

17   cleaning outside, taking care of the pool.  Just

18   anything she needs.

19        Q.    Okay.  And approximately how long have

20   you known Lillian?

21        A.    About six years.

22        Q.    And about how many days a week are you

23   there?

24        A.    Now I'm there two days a week.  I used

25   to be there three days a week.

1          Q.    Okay.  And were you doing that back in

2     April of 2014?

3          A.    Yes.

4          Q.    Okay.  And are you familiar with her

5     son Kenneth Goldsmith?

6          A.    Yes, I am.

7          Q.    Do you see him in the courtroom today?

8          A.    Yes.

9                MR. SHEETS:  Stipulate to I.D.

10               MS. CAPONE:  Thank you.

11         Q.    I'm going to draw your attention

12    specifically to April 1st of 2014.  Were you aware

13    there was a -- an order that Kenneth Goldsmith was

14    not allowed 300 feet within Lillian?

15         A.    Yes.

16         Q.    And on this particular date, you recall

17    Kenneth Goldsmith coming to Lillian's home on or

18    about April 1st?

19         A.    He was there, yes.

20         Q.    Okay.  And what do you recall

21    happening?

22         A.    You mean the day the police came?

23         Q.    Yes.

24         A.    If I remember correctly, she had asked

25    him to leave that day.  And when I came, he was

```
1        out in the car.  And I believe Malcolm and his
2        daughter were there.
3            Q.     Is that another son of hers?
4            A.     Yes, and her daughter.  And they had
5        gone out and --
6                   MR. SHEETS:  I'm sorry; the pronoun
7        "they."  Who are we talking about?
8                   MS. CAPONE:  Malcolm.
9                   THE WITNESS:  Her other son.  And her
10       daughter.
11                  MR. SHEETS:  Okay.
12                  THE WITNESS:  If this is the day you're
13       talking about, they left, and they said, "If Kenny
14       comes, don't let him in the house -- back in the
15       house again."  And I think he had Lillian's car.
16                  MS. CAPONE:  Q.  Who's "he," Ken?
17           A.     Ken.  And the side door was locked and
18       the back door was locked.  And I had been doing
19       something, so I had the front door open.  And I
20       happened to see the car come up the driveway, so I
21       shut the front door and I locked it.  And he came
22       to the side door, and I hollered out, "Kenny, you
23       aren't supposed to be here.  You have to leave."
24       And he didn't answer me.  And then I heard the
25       back door being rattled, and he didn't answer me.
```

1    And I'm hollering at him.  And I didn't see him.

2    He just disappeared.  Next thing I know is there's

3    noise in the basement, and all of a sudden he

4    comes up the basement steps.

5          And I said, "Kenny, you're not supposed

6    to be here."  And he just said, "I just talked to

7    my mother, and I'm allowed to be here."  And I

8    said, "Well, they just left not long ago and

9    you're not allowed to be here."  So he wouldn't

10    leave.  And soon the police came in the door, the

11    back door.  I let them in.  They knocked.  And he

12    said the same thing to the police, that he was

13    allowed to be there, that is it was his house.

14    And the police said, "Well, it's funny, because

15    your mother and brother were just at the police

16    station and they said to come here and put you

17    out."

18        Q.    Okay.  And that's what you recall

19    happening?

20        A.    Yes.

21         MS. CAPONE:  Okay; offer for cross.

22         THE COURT:  Mr. Sheets?

23       CROSS-EXAMINATION BY MR. SHEETS:

24         MR. SHEETS:  Q.  Ms. Peters, the entire

25    story you just told us about Kenny being in the

1    home when he wasn't supposed to be and the police

2    arriving and coming to the back door, none of that

3    --

4        A.    No, the front door.

5        Q.    Front door.  None of that occurred on

6    April 1st?

7        A.    I don't know what date that was.  I

8    just -- it sticks out in my mind a lot.

9        Q.    That incident sticks out in your mind?

10       A.    Yes, it does.

11       Q.    On April the 1st of this year, did you

12   see Kenneth Goldsmith at Lillian Goldsmith's home?

13       A.    I don't know whether it was April 1st

14   or not.  I've seen him there many times.

15       Q.    Let me ask you this.  You've seen him

16   there many times; sometimes with Lillian's

17   permission, other times without, right?

18       A.    I wouldn't say it was her permission.

19   She would ask him to leave often, and he wouldn't

20   (inaudible).

21       Q.    Ms. Peters, let me ask you this

22   question.  Currently, you said you work two days a

23   week for Ms. Goldsmith?

24       A.    Um-hum.

25       Q.    What days?

1          A.     I work on Monday and Wednesday.

2          Q.     Monday and Wednesday?

3          A.     Right.

4          Q.     Okay.  You said previously you had

5     worked three days a week.  How long ago?

6          A.     Monday, Wednesday and Friday.

7          Q.     Monday, Wednesday and Friday.  So you

8     in fact have never been employed by Ms. Goldsmith

9     on Tuesdays?

10         A.     No.

11         Q.     So if April the 1st of 2014 was a

12    Tuesday, you would agree with me you probably were

13    not there that day?

14         A.     Probably not.

15         Q.     Okay.  Did you ever see Kenneth

16    Goldsmith remove a cell phone or any keys from

17    Ms. Goldsmith's home?

18         A.     Actually see him take them and remove

19    them?

20         Q.     That's my question.

21         A.     No.

22                MR. SHEETS:  I have no further

23    questions of this witness, Your Honor.

24                MS. CAPONE:  I have a few, Your Honor,

25    if I may, briefly.

25

1          THE COURT:  You may.

2          REDIRECT EXAMINATION BY MS. CAPONE:

3          MS. CAPONE:  Q.  Ma'am, do you recall

4    the police coming and removing Kenny on or around

5    April 1st?

6          A.    Yes.

7          Q.    And were you aware also that Lillian's

8    phone and car keys were missing?

9          A.    Yes.

10         Q.    Okay.  And were you present at any time

11   when she spoke with Ken either on the phone or in

12   person about taking her phone and car keys?

13         A.    Yes.

14         Q.    Okay.

15         A.    And he would unplug the phone in the

16   house.  And she'd say, "Please plug my phones in.

17   I can't call."  "I can't find my phone.  Somebody

18   took it."  And I said, "Maybe it's laying around

19   here somewhere."  But we couldn't find it.

20         MS. CAPONE:  Okay.  Thank you.

21         MR. SHEETS:  Nothing.

22         MS. CAPONE:  Are you done?

23         MR. SHEETS:  Yes.  No further

24   questions.

25         MS. CAPONE:  I'm going to call Fred.

26

1    Are you going to stipulate?

2              MR. SHEETS:  Yeah.

3              MS. CAPONE:  Thank you.  Then you can

4    go back in the hallway.

5              I have two -- Your Honor, we might have

6    a stipulation so I don't have to call the last

7    person.

8              Your Honor, we have a stipulation where

9    I won't be calling Fred Goldsmith, the other son,

10   Your Honor.  I was just going to have him verify,

11   Your Honor, with Commonwealth's Exhibits 1 and 2.

12   This is an order from February 2014 where

13   Mr. Goldsmith is not allowed near his mother.  And

14   Your Honor, then I have an order from the Court, a

15   judge denying -- Mr. Goldsmith went and tried to

16   get an order against his own mother, and they

17   found it not necessary and denied his order.

18             MR. SHEETS:  Which is from February

19   2nd.

20             May I see the first one, Judge?  Just

21   so the stipulation is correct, this is an

22   emergency PFA which, my understanding, is granted

23   for a period of 24 hours.  So we will stipulate

24   that, on February 3rd of 2014, two months before

25   this alleged incident, Lillian Goldsmith had a

1    24-hour PFA.

2              MS. CAPONE:  And then I have this one.

3    Do you want me to just call him?  I'll call him.

4              MR. SHEETS:  No, there's no reason.

5              Judge, here's another stipulation I'll

6    make.  This family is battling in every court in

7    the Commonwealth of Pennsylvania -- Orphans'

8    Court, Civil Court.  There is an order from Judge

9    O'Reilly in Orphans' Court denying Mr. -- Civil

10   Court, denying Mr. Goldsmith's -- telling him to

11   not be within 300 feet of his mother and his

12   brother and their respective residences and his

13   brother's business address.

14             I will so stipulate that order is in

15   effect and Judge O'Reilly has attempted to fine

16   Mr. Goldsmith in excess of $19,000 for violating

17   that order.  So I don't believe at this time,

18   unless Fred Goldsmith would add anything else,

19   it's necessary to call him.

20             MS. CAPONE:  And we would rest, Your

21   Honor.

22             THE COURT:  Any argument?

23             MR. SHEETS:  Yes.  Well, I mean, a

24   couple of things.  First of all, one, on just -- I

25   don't know what kind of basis, legal or

1    otherwise -- I don't believe the Commonwealth has

2    established that there was a series of telephone

3    calls that harassed, annoyed or alarmed

4    Ms. Goldsmith, either through her own testimony or

5    any kind of phone records or any other evidence

6    today, even prima facially, that Mr. Goldsmith

7    engaged on April 1st in harassment.

8           I don't believe that the trespass rises

9    to the level of a Felony 3.  And reading the

10    statute, there are far more applicable subsections

11    of the trespass statute that if -- see, Your

12    Honor, if they have to allege the dates when these

13    things occurred and they're saying that, on April

14    1st, Mr. Goldsmith was at that residence, well,

15    Ms. Goldsmith clearly could not establish that

16    because she can't -- she could not remember --

17    unfortunately remember much about April 1st,

18    specifically.  And I understand that given her age

19    and the close proximity of these alleged events to

20    the passing of her husband, but she hasn't

21    established that he was there on April 1st.  She

22    didn't establish he was there on March 31st.  She

23    didn't establish he was there on April 2nd.  So

24    it's not "on or about."

25           There's no evidence of harassment.  And

1    as far as theft by unlawful taking, nobody

2    established that my client, Kenneth Goldsmith,

3    took anything.  And their other witness, Ms. Norma

4    Peters, admits that if these things allegedly

5    occurred on April 1st, the Court can take judicial

6    notice April 1st of this year was a Tuesday.  That

7    young woman was never there that day.  And the

8    specific -- the officer -- Julie asked him if he

9    did a report.  He says in his report he got the

10    call on April 1st at 22:05, which I believe is

11    10:05 in the evening.  And she reports that on the

12    31st, those things were there.  On the 1st, she

13    couldn't find them.  And then I think -- okay.

14    But is it in the report about the woman seeing him

15    come out of the basement?

16            MS. CAPONE:  No.

17            MR. SHEETS:  Okay.  I didn't think so.

18    Right.  So, Your Honor -- and in deference to

19    Ms. Goldsmith, I don't think this case would do

20    very well -- nor would the alleged victim's case

21    -- at the Court of Common Pleas level considering

22    that her inability to remember is going to be --

23    you know, a serious issue at the Court of Common

24    Pleas level where the burden is much higher.  But

25    even prima facially I don't believe that they've

30

1    established that, on or about April 1st,

2    Mr. Goldsmith either harassed, trespassed or stole

3    anything, Your Honor.

4              THE COURT:  All right.  Does the

5    Commonwealth have any response?

6              MS. CAPONE:  I do, Your Honor.  Thank

7    you.

8              Your Honor, as far as the theft goes,

9    Your Honor, I concede that we did not prove that

10   charge.  However, as far as the criminal trespass

11   and harassment, Your Honor, we've more than proved

12   a prima facie case.  The reason I ended up calling

13   the second witness, Your Honor, was because I know

14   Ms. Goldsmith's memory is foggy.  She told you

15   several times that she has trouble remembering.

16   Your Honor, what's not at issue is the police told

17   you they've been called here many times up until

18   this date.

19             We provided a court document that he's

20   to have no contact and stay 300 feet away.  And

21   you heard from witnesses that he has gone there

22   repeatedly, called repeatedly, and unplugged her

23   phone, which I would say would more than

24   constitute harassment.  It's a dangerous

25   situation.  She says she doesn't feel comfortable

1    around him.  And you can tell that she's not

2    someone who can fight him off if she's in that

3    kind of situation.  So I think that we did meet

4    criminal trespass and harassment.

5              THE COURT:  Well, I mean, the Court

6    finds that the Commonwealth has not established a

7    prima facie case.  The witness testified she

8    didn't work there on a Tuesday.  She never worked

9    there on a Tuesday.  This incident allegedly

10   happened on a Tuesday.  The victim can't recall

11   too many details, particularly the date that it

12   occurred.  I find that there just hasn't -- the

13   Commonwealth has not established a prima facie

14   case.

15             MR. SHEETS:  Thank you, Your Honor.

16             MS. CAPONE:  Your Honor, as far as

17   harassment, if I may, we had to show that repeated

18   times.  And she said up until this date.  And I

19   said "on or about?"  I mean, this has been going

20   on and on.  There's several different courts

21   involved.  I mean, she told you that he ripped the

22   phone -- I mean --

23             THE COURT:  He may have, but when?

24   You're alleging April 1st.

25             MS. CAPONE:  Then would you consider a

1    summary harassment and keep it here and have a 90

2    day -- a mental health evaluation on a summary

3    harassment?

4           THE COURT:  Yeah.

5           MR. SHEETS:  You know what's going to

6    happen.

7           THE COURT:  What's going to happen?

8           MR. SHEETS:  He's going to file an in

9    forma pauperis and we're going to end up

10   litigating this thing again in front of Judge

11   Gallo and dragging this 85-year-old woman back to

12   court.

13          MS. CAPONE:  That's fine, Your Honor.

14   But he can't go near her.  Someone has to protect

15   her.  She's 84 years old.

16          THE COURT:  There's an existing PFA.

17          MR. SHEETS:  It's in effect.  Yes.

18          THE COURT:  Correct?

19          MR. SHEETS:  Yes.

20          MS. CAPONE:  It's a civil one, Your

21   Honor.  This is a criminal system that -- we need

22   to protect her.  He's going to her house and

23   ripping her phone out.

24          THE COURT:  Why hasn't she applied for

25   a PFA?

 1              MS. CAPONE:  Your Honor, she doesn't

 2    hardly know, as you saw, what's going on.  That's

 3    why I had her caretaker come here.

 4              THE COURT:  Right.

 5              MS. CAPONE:  I have her other son, if

 6    you want to hear from him, how dangerous -- they

 7    have to have a detailed officer come in.

 8              THE COURT:  I mean, it's your case.

 9    And you've got a establish a prima facie case.

10    And your witness just can't recall enough details

11    to establish a case.

12              MS. CAPONE:  I still think she said

13    enough times he's come there and unplugged her

14    phone.  And the witness was there for a summary

15    harassment.

16              THE COURT:  You're alleging this

17    incident on this day.  I'm sympathetic with your

18    plight, but you still have to establish a prima

19    facie case, and I don't think you've done it.

20              MR. SHEETS:  Thank you, Your Honor.

21    (Whereupon the proceedings were concluded.)

22

23

24

25

34

1    COMMONWEALTH OF PENNSYLVANIA    )

2                                 )    SS:

3    COUNTY OF ALLEGHENY            )

4

5

6

7                  CERTIFICATE OF REPORTER:

8

9

10       On this 4th day of September, 2014, I, Jeanne

11   M. Nagy, do hereby certify that the evidence and

12   proceedings are contained fully and accurately in

13   the machine shorthand notes taken by me at the

14   hearing of the within cause, and that the same

15   were transcribed under my supervision and

16   direction, and that this is a correct

17   transcription of the same.

18

19

20                       _____

21                       Jeanne M. Nagy
                            Official Court Reporter

22                       Court of Common Pleas

23

24

25